# 24-2196

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆ ◆

GEORGE SANTOS,

*Plaintiff-Appellant,*

—against—

JAMES C. KIMMEL, AKA JIMMY KIMMEL, AMERICAN BROADCASTING COMPANIES, INC., THE WALT DISNEY COMPANY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

ROBERT M. FANTONE
MANCILLA & FANTONE LLP
260 Madison Avenue, 22nd Floor
New York, New York 10016
(646) 225-6686

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ...............................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................... 2

STATEMENT OF THE CASE ............................................................. 3

    A. Nature of the Case ..................................................................3

    B. Factual Background .............................................................4

    C. Procedural History and the District Court Rulings ............................. 7

SUMMARY OF ARGUMENT ...............................................................9

LEGAL STANDARD................................................................... 10

ARGUMENT ................................................................................ 10

I. THE DISTRICT COURT ERRED IN DISMISSING THE COPYRIGHT
CLAIM AT THE PLEADING STAGE BASED ON FAIR USE ......................... 10

    A. Fair Use Factors Were Improperly Weighed .......................... 12

        1. Purpose and Character of Use....................................... 10
        2. Nature of the Copyrighted Work................................... 16
        3. Amount and Substantiality Used................................... 17
        4. Effect on the Market .................................................. 18
        5. Overall Balance of Factors ..........................................21

    B. The Appellees Should Not Be Permitted to Invoke the Fair Use
Doctrine to Shield Their Deceptive Conduct ............................... 21

II. DISMISSAL AT THE MOTION TO DISMISS STAGE IS PREMATURE
BECAUSE FAIR USE IS NOT CLEARLY ESTABLISHED ON THE FACE
OF THE COMPLAINT ........................................................... 22

III. THE DISTRICT COURT ERRED IN FINDING THAT FEDERAL LAW
PREEMPTS APPELLANT'S STATE LAW CLAIMS .......................................... 26

    A. The Contractual Claims Pertaining To The Defendants'
    Misrepresentations Of Their Identities Are Qualitatively Different
    from Copyright Claims .................................................................... 26

    B. The Fraudulent Inducement Claim Is Not Preempted Because It
    Seeks Disgorgement ....................................................................... 28

    C. The District Court's Preemption Analysis Would Create a
    Dangerous Precedent....................................................................... 29

CONCLUSION .................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith ("Warhol I")*,
    11 F.4th 26, 43 (2d Cir. 2021) ......................................................... 16, 18, 19

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508, 519, 143 S. Ct. 1258, 1268 (2023) ............................. 10-13, 15

*Apple Inc. v. Corellium, LLC,*
    No. 19-81160-cv, 2020 U.S. Dist. LEXIS 136419 (S.D. Fla. July 30,
    2020) ............................................................................................... 23, 25

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................... 9

*Authors Guild v. Google, Inc.,*
    804 F.3d 202 (2d Cir. 2015) ............................................................. 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................... 9

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006) ........................................................... 10

*Brevet Holdings, LLC v. Enascor, LLC,*
    No. 21-cv-01540, 2022 U.S. Dist. LEXIS 17461 (S.D.N.Y. August 31,
    2022) ............................................................................................28

*BWP Media USA, Inc. v. Gossip Cop Media, LLC*,
    87 F. Supp. 3d 499 (S.D.N.Y. 2015) .............................................. 22

*Capitol Records, LLC v. ReDigi Inc.,*
    910 F.3d 649 (2d Cir. 2018) .............................................................19

*Forest Park Pictures v. Universal TV Network, Inc.,*
    683 F.3d 424 (2d Cir. 2012) ......................................................... 27

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1 (2021) .............................................................. 14, 15, 18

*Harper & Row Publishers v. Nation Enters.*,
  471 U.S. 539 (1985) ................................................................ 14

*Hachette Book Grp., Inc. v. Internet Archive*,
  115 F.4th 163 (2d Cir. 2024) ................................................18, 24

*Kelly-Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013) .......................................................25

*Krafton, Inc. v. Apple, Inc.,*
  No. CV 22-209-GW-MRWx, 2023 U.S. Dist. LEXIS 53494 (C.D.
  Cal. Feb. 24, 2023) ................................................................23, 24

*Melendez v. Sirius XM Radio, Inc.*,
  50 F.4th 294 (2d Cir. 2022) ....................................................... 26

*Michael Grecco Productions, Inc. v. RADesign, Inc.*,
  112 F.4th 144 (2d Cir. 2024). ..................................................... 9

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004) ................................................ 10, 14

*Paramount Pictures Corp. v. Puzo*,
  No. 12-cv-1268, 2012 U.S. Dist. LEXIS 139827 (S.D.N.Y. 2012) ........... 27

*People v. Ernst & Young, LLP*,
  114 A.D.3d 569 (1st Dept. 2014) ..................................................28

*Point 4 Data Corp. v. Tri-State Surgical Supply*,
  2019 U.S. Dist. LEXIS 250232 (E.D.N.Y. March 26, 2019).....................27

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ......................................................... 14

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016) ....................................................... 22

iv

*Universal Instruments Corp. v. Micro Systems Engineering, Inc.*,
    924 F.3d 32 (2d Cir. 2019) ............................................................. 26

*Warner Bros. Entm't Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) ..................................... 24, 27

*Yang v. Mic Network, Inc.*,
    405 F. Supp. 3d 537 (S.D.N.Y. 2019) .......................................... 10

## **Statutes**

Fed. R. Civ. P. 12 .........................................................................6, 9, 22

17 U.S.C. § 101 ..................................................................................... 1

17 U.S.C. § 106 .................................................................................. 29

17 U.S.C. § 107 ............................................................................10, 18

28 U.S.C. § 1331 ................................................................................... 1

28 U.S.C. § 1338 ................................................................................... 1

28 U.S.C. § 1367 ................................................................................... 1

28 U.S.C. § 1291 ................................................................................... 1

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 because this action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq. The district court had supplemental jurisdiction over Appellant's state law claims pursuant to 28 U.S.C. § 1367(a). This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment dismissing all claims with prejudice, which was entered on August 19, 2024, with the notice of appeal filing dated August 20, 2024.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in concluding that the Appellees' secondary use of copyrighted works was "transformative," given that the Appellees' purpose in initiating and assisting the creation of the works was identical to their purpose of the secondary use of the works.

2. Whether the district court improperly discounted evidence of "bad faith" in the fair use analysis where the Appellees caused the creation of copyrighted works through fraudulent means (instead of using fraudulent means to merely obtain access to copyrighted works that were already created).

3. Whether the district court erred in resolving issues of fact against the Appellant that were material to the fair use analysis, including facts related to the Appellees' intent and conduct, whether such conduct would affect any

relevant market, and whether the Appellant previously published the copyrighted works.

4. Whether the district court erred in ruling that the fair use defense was available to the Appellees in light of the Appellees' fraudulent conduct.

5. Whether the district court erred in finding Appellant's state law claims preempted by the Copyright Act where those claims arose from the Appellees' misrepresentation of their identities in violation of applicable contractual provisions.

## STATEMENT OF THE CASE

### A. Nature of the Case

This appeal arises from the district court's dismissal of claims pursuant to Rule 12(b)(6) that stem from the Appellees' orchestrated scheme to fraudulently obtain and commercially exploit copyrighted content through the Cameo digital platform. The case presents novel questions about the intersection of fair use doctrine with fraudulently induced content creation, and whether the Copyright Act preempts state law claims arising from identity misrepresentation in digital transactions.

## B. Factual Background

### 1. The Cameo Platform and Terms of Service

Cameo is an online platform that allows celebrities and public figures ("Talent") to create personalized video messages for fans ("Users") in exchange for payment. A-10 at ¶13.[1] The relationship between Talent and Users is governed by Cameo's Terms of Service, which establish two distinct licensing frameworks: personal use licenses and commercial use licenses. A-10-11 at ¶¶14-16. Neither license permits television broadcast use, which requires separate negotiation between Talent and Users. A-11 at ¶16.

Critically, the Terms of Service explicitly prohibit Users from "creat[ing] a Site account using a false identity or providing false information." A-21 at ¶74. This requirement ensures transparency in transactions and enables Talent to make informed decisions about content creation and pricing.

### 2. Appellees' Fraudulent Scheme

In December 2023, following Appellant George Santos' departure from Congress, he created a profile on Cameo to offer personalized video messages. A-10 at ¶13. Between December 6 and 7, 2023, Defendant Kimmel, through multiple fake identities, submitted at least fourteen requests for personalized videos from Santos. A-11 at ¶20. Each request was submitted under the pretense of being

---

[1] Citations to "A-" refer to the Joint Record on Appeal, followed by the page number.

from a legitimate fan seeking content for personal use. These requests included deliberately absurd scenarios designed to mock Santos, including:

- A request to congratulate someone for "winning the Clearwater Florida Beef Eating Contest" by consuming "6 pounds of loose ground beef in under 30 minutes" (A-18 at ¶60(a));

- A message celebrating the "successful cloning" of a "beloved schnauzer Adolf" (A-18 at ¶60(b));

- Congratulations to a "legally blind niece" for passing her driving test despite concerns that she "shouldn't" drive (A-18 at ¶60(d)).

### 3. The Unauthorized Commercial Exploitation

Relying on the Appellees' misrepresentations about their identity and intended use, Santos created the requested videos under personal use licenses (the "Works"). A-12 at ¶¶21-22. Santos used the scripts provided by the Appellees to create the Works (A-12 ¶21, A-18 ¶60), and the Appellees relinquished any rights they may have had in the Works via the Cameo Terms of Service. A-11 ¶18, A-70 ¶8(a). Without authorization or proper licensing, the Appellees then aired five of these videos on the "Jimmy Kimmel Live!" program on December 7 and 11, 2023, incorporating them into segments titled "Will Santos Say It?" A-12 at ¶¶24-25.

During these broadcasts, Kimmel openly admitted to the deceptive scheme, stating that he "didn't say they were from me" and that he wanted to "see what

[Santos] would read and what he wouldn't read." A-13 at ¶27. The Appellees further exploited the videos by publishing them across various ABC social media platforms, including YouTube (19.2 million subscribers), Instagram (5 million followers), TikTok (1.3 million followers), and X (2 million followers). A-12 at ¶24.

### 4. The Market Impact

The Appellees' conduct not only violated Santos' rights but also threatened the integrity of the Cameo platform itself. By circumventing the platform's licensing structure through deception, the Appellees not only undermined the price differentiation mechanism that makes the platform economically viable for creators (A-17 at ¶51), but also demonstrated that celebrity users of the Cameo platform cannot control the use of their content, persona, or likeness as guaranteed by Cameo. The Appellees' actions created precedent that Cameo's Terms of Service can be easily circumvented through deception, devaluing the Cameo platform and, by virtue of its impact to copyright in general, the entire marketplace. *Id*.

## C. Procedural History And The District Court Rulings

On February 17, 2024, Santos filed his initial complaint asserting claims for copyright infringement, fraudulent inducement, breach of contract, and unjust enrichment. A-228. Following a conference on April 18, 2024, and in accordance with the district court's scheduling order, Santos filed an Amended Complaint on

May 24, 2024, adding a claim for breach of implied contract. *Id*. The Appellees moved to dismiss pursuant to Rule 12(b)(6), arguing primarily that their secondary use of the Works on the Jimmy Kimmel Live! program constituted fair use under copyright law, and that the state law claims were preempted by the Copyright Act. A-229.

The district court granted the Appellees' motion to dismiss on August 19, 2024, finding fair use was "clearly established" on the face of the complaint and that all state law claims were preempted. A-241-249. Specifically, the district court ruled that Santos' purpose in creating the Works was to inspire his fans, while the Appellees' purpose behind their secondary use of the work was to mock Santos and the Works themselves, thus rendering the Appellees' use transformative. A-232-237.

The district court further ruled that the Appellees' fraudulent conduct in "procuring personal-use licenses using accounts with fake names (rather than forthrightly negotiating a commercial fee)" did not preclude the application of the fair use defense. A-237. The district court went on to resolve factual issues in favor of the Appellees, including whether the Appellant had previously published the copyrighted Works (A-239), and finding that there is no protectible market that the Appellees' conduct, if wide-spread, would adversely affect. A-240-41.

The district court's decision marked the first time any court has found fair use "clearly established" at the pleading stage in a case where a defendant fraudulently induced the creation of copyrighted works. The decision also adopted an expansive view of Copyright Act preemption that would effectively immunize bad actors who use fraud to obtain copyrighted content for commercial exploitation, and would leave Cameo and Cameo's celebrity users powerless to enforce their rights pursuant to Cameo's Terms of Service.

Santos filed a timely Notice of Appeal on August 20, 2024, and files the instant Appellant's Brief in support of his appeal.

## <u>SUMMARY OF ARGUMENT</u>

The district court erred in determining that the fair use doctrine mandates dismissal of the Appellant's claims for the following reasons:

First, the district court erred in finding that the Appellees' secondary use of copyrighted works was "transformative" because the district court improperly relied on Santos' fraudulently induced "purpose" while ignoring Appellees' role in manufacturing that purpose. The first fair use factor weighs against dismissal because Appellees' use was not transformative – the nature and purpose of the original Works, instigated by the Appellees and scripted for their late night broadcasts, was identical to the subsequent use in broadcasting them.

Second, the district court misapplied the remaining fair use factors. The court erred in finding the Works were previously published despite contrary allegations in the Amended Complaint. The court improperly deemed the wholesale copying of the Works "neutral" based solely on its flawed transformative use finding. The court also dismissed market harm as "speculative" while ignoring the Amended Complaint's specific allegations that Appellees' conduct undermined Cameo's platform and pricing model.

Third, the fair use doctrine, as an equitable defense, should not be available to parties who fraudulently induce the creation of copyrighted works. The district court's ruling creates a perverse "deceiver's privilege" that would allow bad actors to exploit creators by fraudulently manufacturing content for criticism. This undermines copyright law's constitutional purpose of promoting creative expression.

Fourth, even if fair use analysis were appropriate, dismissal at the pleading stage was premature given the fact-intensive nature of the affirmative defense and multiple disputed factual issues requiring discovery. These include Appellees' true purpose and intent, the extent of their fraudulent scheme, the Works' publication status, and economic impact on Santos and the relevant markets. Expert testimony is particularly needed regarding market harm and industry practices.

Finally, the district court erred in finding Appellant's state law claims preempted by the Copyright Act because those claims arose from the Appellees' misrepresentation of their identity in violation of applicable contractual provisions that established qualitatively different rights than the Appellant's rights pursuant to the Copyright Act.

## LEGAL STANDARD

"The court of appeals reviews a district court's grant of a motion to dismiss *de novo*, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Michael Grecco Productions, Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024). To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**ARGUMENT**

**I.**

**THE DISTRICT COURT ERRED IN DISMISSING THE COPYRIGHT CLAIM AT THE PLEADING STAGE BASED ON FAIR USE**

**A.    Fair Use Factors Were Improperly Weighed**

"The first factor, 'purpose and character of use,' involves three sub-factors, which involve determining whether the use is: (1) transformative; (2) for commercial purposes; or (3) in bad faith." *Yang v. Mic Network, Inc*., 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) (*citing NXIVM Corp. v. Ross Inst*., 364 F.3d 471, 477-78 (2d Cir. 2004)). The first factor under 17 U.S.C. § 107(1) is the "heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). Each of these sub-factors weighs against fair use.

For the following reasons, the fair use doctrine does not warrant dismissal of Santos' Copyright claims, especially at the pleading stage:

1. Purpose and Character of Use

(a) The Appellees' Secondary Use of the Works Was Not Transformative

"[T]he first factor (which is just one factor in a larger analysis) asks whether and to what extent the use at issue has a purpose or character different from the original." *Andy Warhol Fund for the Visual Arts, Inc. v. Goldsmith*, ("*Warhol*") 598 U.S. 508, 529 (2023) (internal citations and quotations omitted). The first question is thus what was the purpose of the original creation. *Id*. The second question is

10  of 31

then what was the purpose of the secondary use. "A [secondary] use that has a further purpose or different character is said to be 'transformative.'" *Id*.

The district court relied heavily on *Warhol* in ruling that the Appellees' secondary use of the Works was transformative, stating:

> In short, a reasonable observer would understand that JKL showed the Videos to comment on the willingness of Santos – a public figure who had recently been expelled from Congress for allegedly fraudulent activity including enriching himself through a fraudulent contribution scheme -- to say absurd things for money. Thus, the Videos were used for political commentary and criticism, purposes that do not supersede the "objects" of the original Videos. *Warhol*, 598 U.S. at 539.

A-235. The district court goes on to state: "Here, the purpose of the defendants' use was clearly for criticism and commentary of the Videos themselves and their author." A-236.

The district court's logic here is fundamentally flawed. While we agree with the district court's assessment of what a "reasonable observer" would understand the purpose of Appellees' secondary use of the Works to be, the district court failed to recognize that such purpose was identical to the original purpose behind the creation of the Works. There is no question that the Appellees instigated the creation of the original Works and are thus the designers of its purpose (A-8 at ¶¶1-2, 20), which was to illustrate Santos' alleged "willingness […] to say absurd things for money." A-235. Put simply, the district court failed to recognize that

Appellees' purpose in causing Santos to create the Works (via deception) was identical to their purpose in using them.

Drawing from the Amended Complaint, the district court declared the original purpose of the Works to be Santos' desire "'to generate an inspiring message' and 'convey his feelings of hope, strength, perseverance, encouragement, and positivity.'" A-236. However, Santos' intentions, born solely from the Appellees' fraud and deceit, served as a mocking pretense for the Appellees' true purpose in instigating the creation of the Works.

Despite the district court's acknowledgement that the "defendants wrote the messages" that served as scripts for the Works (*see* A-238; *see also* A-18 ¶60),[2] the district court still failed to properly account for the Appellees' purpose in assisting in the creation of the Works[3] when analyzing the first prong of the fair use defense. The district court's mischaracterization of the true purpose behind the Works led to its flawed conclusion that the Appellees' secondary use of the Works was transformative.

The district court attempts to justify its denial of this conclusion (*citing Warhol,* 598 U.S. at 544-45) by explaining that the "subjective intent" behind the Appellees' secondary use of the Works is irrelevant. A-235, n.1. This, however,

---

[2] The district court noted this in a separate part of its decision where it discussed the "nature of the work", the second factor of the fair use analysis. A-238.

[3] While the Appellees jointly participated in the creation of the Works, they received no copyright in the Works by virtue of the Cameo Terms of Service. A-11 ¶18, A-70 ¶8(a).

does not explain how the Appellees' secondary use of the Works was *objectively* different from the purpose behind the original Works, which is required for the secondary use to be transformative. *Warhol*, 598 U.S. at 545 ("Whether the purpose and character of a use weighs in favor of fair use is [...] an objective inquiry into what use was made, i.e. what the user does with the original work").

Lastly, depositions, communications between the Appellees and staff, and other paper discovery would likely produce evidence to better illustrate that the true purpose and nature of Santos' Works were in fact that of the Appellees, as his production of the Works were merely pieces of their scheme. Without understanding the full extent of the Appellees' conduct, the district court's ruling that Appellees' use was transformative was premature. Development of the factual record is necessary to permit the district court to conduct a fully-informed fair use analysis.

    (b) <u>The District Court Misapplied the First Fair Use Factor by Minimizing Appellees' Bad Faith</u>

The district court fundamentally erred by failing to properly weigh the bad faith presented by the unique set of facts in this case – i.e. finding that the fair use doctrine shielded the Appellees even though they caused the creation of the Works through their own admitted fraud and deception. This presents a novel question that strikes at the heart of copyright law's constitutional purpose "to promote the

progress of science and useful arts." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2021).

The district court's treatment of Appellees' admitted deception as irrelevant to the transformative use analysis represents a significant departure from copyright law's foundational principles. The Supreme Court has long recognized that fair use "presupposes good faith and fair dealing." *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 562-63 (1985). This presupposition of good faith is not merely advisory - it reflects copyright law's fundamental purpose of promoting creativity while ensuring fair compensation for creators. While the district court appeared to have acknowledged this principle, it dismissed its application here by relying on the evolved insignificance of "bad faith" that has come about due solely to cases in which the fraudulent conduct was much different than the Appellees'. *See* A-237 ("bad faith is not dispositive' of the fair use question, or even of the first factor'") (*quoting NXIVM Corp.,* 364 F.3d at 479).

This analysis fundamentally misapprehends the nature of Appellees' misconduct. The cases cited by the district court all involved situations where a defendant's alleged "bad faith" occurred in connection with accessing copyrighted work after the work was already created. *See, e.g., NXIVM Corp.*, 364 F.3d at 478 (involving unauthorized access to pre-existing materials); *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 90 (2d Cir. 2014) (involving unauthorized

recording of an earnings call). Here, by contrast, Appellees' "bad faith" was of a starkly different and particularly troubling nature. Their fraud was the very instrument of the Works' creation – they intentionally deceived Santos to induce him to create the Works for their predetermined exploitative purpose of mocking and criticizing him. A-8 ¶¶1, 20-23.

As alleged in the Amended Complaint, "Defendants openly admitted to deceiving the Plaintiff under the guise of fandom, soliciting personalized videos only to then broadcast these on national television and across social media channels for commercial gain." A-8 at ¶1. If such conduct is protected as fair use, it would effectively sanction fraud as a means of content acquisition, deterring creators from participating in legitimate content creation platforms. As the Supreme Court held in upholding this Court's analysis under *Warhol* (albeit under different circumstances), "such logic would create a kind of privilege that has no basis in copyright law." *Warhol,* 598 U.S. at 544 n.19.

The Supreme Court has recognized that fair use is an "equitable rule of reason" that must be applied to promote the progress of science and useful arts. *Google LLC*, 593 U.S. at 18. The implications of the district court's ruling are particularly alarming in our digital age, where millions create and share original copyrightable content daily. Such a rule would not promote creativity—copyright's core purpose—but instead foster a new type of content industry, one where

"pranksters" could freely deceive creators to generate controversial content for profit. Allowing Appellees to go undeterred risks normalizing a pernicious form of *exploitation*: profit through deception. That is exactly what happened here, a different species of bad faith that, at its core, is simple fraud. Upholding the district court's ruling will open the floodgates for an industry of opportunists who leverage the notoriety of creators by coercively manufacturing "viral" material.

Finally, the district court's conclusion is particularly troubling at the pleading stage where the nature and extent of the Appellees' bad faith is unknown. For example, depositions and evidence of communications between the Appellees would likely reveal the origin of the fraudulent scheme, the true motives of its participants, and the totality of the actors and conduct that facilitated the fraud. These facts would allow for the informed analysis that is required to determine the equitable weight of the Appellees' bad faith conduct in making its fair use determination.

2. <u>Nature of the Copyrighted Work</u>

The Second Circuit has held that creative works are "closer to the core of intended copyright protection." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith ("Warhol I")*, 11 F.4th 26, 45 (2d Cir. 2021). Here, as the district court acknowledged, the Amended Complaint specifically alleges that the Works were:

> [c]reated by Santos using his own effort, creativity, and unique personality traits' and 'capture Santos's unique and distinctive

form of motivational expression both in the personalized and engaging manner in which the videos are captured and in the originality with which Santos conveys his feelings of hope, strength, perseverance, encouragement, and positivity.'

A-238 (*citing* A-14 at ¶36). The district court acknowledged that the Works were "more expressive than factual" but concluded this factor weighed only slightly in Santos' favor because it concluded that he had previously published the Works. A-238-239.

The finding that Santos had previously published the Works was premature. The Amended Complaint explicitly alleges that Santos "did not publish the Works to anyone except [Appellees] under a personal use license and did not do so voluntarily because the [Appellees] misrepresented their identity and intended scope of use." A-16 at ¶44. The district court's contrary conclusion required improper factual determinations inappropriate for a motion to dismiss.

3. Amount and Substantiality Used

While acknowledging that Appellees used the Works in their entirety, the district court erroneously concluded this factor was "neutral" because "the use was transformative." A-240. This reasoning improperly bootstraps the district court's flawed "transformative" analysis to neutralize a factor that should weigh against fair use. As the Second Circuit has recognized, copying "the entirety of a work is sometimes necessary to make a fair use," but this necessity must be "tethered to a

valid, and transformative, purpose." *Google LLC*, 593 U.S. 1 at 34-35. Here, as discussed above, Appellees' use was not tethered to a transformative purpose.

## 4. Effect on the Market

The fourth and final fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The district court's conclusion that there is "no protectible derivative market for criticism" (A-241) improperly concludes that Santos would not have had a market for the spoof videos (the Works) the Appellees tricked him into creating. Here, the Appellees' conduct "damage[d] the market for the first [Work]" by depriving Santos of the higher licensing fee that he would charge for secondary use akin to the Appellees'. *Warhol I*, 11 F.4th at 48.

Additionally, this Court has made clear that "[i]n assessing the fourth factor, we consider not only the market harm caused by the particular actions of the alleged infringer, but also the market harm that would result from unrestricted and widespread conduct of the same sort." *Hachette Book Grp., Inc.,* 115 F.4th at 189 (internal citations and quotations omitted); *see also Warhol I,* 11 F.4th at 48. Courts "routinely rely on such logical inferences where appropriate in assessing the fourth fair use factor"; *Hachette Book Grp., Inc.*, 115 F.4th at 193 (*citing Authors Guild v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015) (relying on logical inferences rather than empirical data to conclude that the secondary use did not serve as a competing

substitute for the originals); *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662-663 (2d Cir. 2018) (relying on logical inferences rather than empirical data to conclude that the secondary use served as a competing substitute for the originals); *Warhol I*, 11 F.4th at 50 (relying on "self-evident" harm that would result if the defendant's use were to become widespread)).

Here, the Amended Complaint specifically alleges that "Defendants' willful and intentional unauthorized use of the Works devalued the market for Cameo videos, including Santos', by undermining the integrity of the Cameo.com platform for Talent." A-17 at ¶51. This is not merely about the market for criticism - it concerns whether content platforms can maintain viable business models if users can circumvent terms of service through deception.The district court's dismissal of these market concerns as "entirely speculative" (A-242) ignores the concrete allegations in the Amended Complaint about how Appellees' conduct threatens the Cameo marketplace and the marketplace for Santos' Works. A-17 at ¶¶51-52.

Moreover, the full extent of the market harm cannot be properly evaluated without factual development regarding Cameo's business model, the impact of the instant license circumvention, and the broader market implications of sanctioning fraudulent procurement of content. This information, which the parties would likely present through expert reports and testimony, would inform the fair use analysis significantly.

While, the court dismissed Santos's market harm arguments as "entirely speculative" and focused solely on whether there is a "protectible derivative market for criticism" (A-241-242), there is absolutely no valid foundation in the record to support such a conclusion, which is contrary to the allegations in the Amended Complaint. A-17 at ¶51 (Stating that the Appellees' conduct "devalued the market for Cameo videos, including Santos', by undermining the integrity of the Cameo.com platform for Talent"). The district court's thus erred in prematurely finding that this prong weighed in favor of the application of the fair use defense.

5. Overall Balance of Factors

The district court's conclusion that "the defense of fair use is clearly established by the FAC" (A-242) resulted from its failure to properly weigh the factors in light of the unprecedented circumstances alleged. When properly analyzed, particularly considering the fraudulent scheme that procured the Works' creation, none of the factors decisively favors fair use.

This is particularly true since the district court made such a determination at the pleading stage, prior to any development of the factual record. As explained in more depth below in Section II, discovery in this matter is necessary to allow the parties to present evidence relevant to the highly factual fair use analysis. At minimum, these novel circumstances require further factual development before fair use can be determined.

20 of 31

**B.      The Appellees Should Not Be Permitted to Invoke the Fair Use Doctrine to Shield Their Deceptive Conduct**

Alternatively, Santos submits that as a matter of policy the Appellants should be equitably estopped from invoking the fair use doctrine under the circumstances of this case.  The Appellees' scheme to fraudulently induce creation of the Works for the specific purpose of exploitation fundamentally distinguishes this case from traditional fair use cases and should weigh decisively against the availability of the fair use doctrine. In other words, Appellees engineered the very "purpose" they now rely on to claim fair use. As a matter of policy, this logic would allow any bad actors to fraudulently induce content creation under false pretenses, then claim their uses were transformative simply because their actual intended uses differed from the false purpose they presented to the creators.

The district court's ruling effectively immunizes those who fraudulently induce creation of copyrighted works from any liability, so long as they criticize the work in some fashion. This undermines not only copyright law but also the integrity of legitimate content creation platforms. Such an outcome would effectively sanction the manipulation of intellectual output for commercial engagement metrics, undermining both the creator's agency and the integrity of public discourse. The fair use doctrine, as an equitable defense, should not be available to parties who facilitate creation of the very content they seek to exploit through admittedly fraudulent means.

## II.

## DISMISSAL AT THE MOTION TO DISMISS STAGE IS PREMATURE BECAUSE FAIR USE IS NOT CLEARLY ESTABLISHED ON THE FACE OF THE COMPLAINT

The district court's conclusion that fair use was "clearly established" from the face of the complaint represents a misapplication of Rule 12(b)(6) standards and ignores the unique factual complexity of this case. While fair use may occasionally be determined on a motion to dismiss, such cases are exceedingly rare and such a finding is inappropriate where, as here, the secondary use was obtained through an admitted scheme of deception.

The Second Circuit has consistently recognized that fair use determinations typically require factual development beyond the pleading stage. In *TCA Television Corp. v. McCollum*, this Court emphasized that while fair use might theoretically be "clearly established by a complaint," such circumstances are exceptional. *TCA*, 839 F.3d 168, 178 (2d Cir. 2016). Indeed, because fair use is "an open-ended and context sensitive inquiry" that is inherently fact-driven, courts have repeatedly recognized that there is a "dearth of cases granting such a motion." *BWP Media USA, Inc. v. Gossip Cop Media*, LLC, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015).

Here, the district court's premature fair use determination ignored crucial disputed issues and improperly resolved factual ambiguities against Santos. First, the district court's analysis required it to make factual determinations about the

purpose and character of both the original work and the secondary use –
determinations that necessarily relied on disputed facts and inferences that should
have been resolved in Santos' favor at this stage. For example, as explained above,
discovery will help the parties understand the Appellees' precise purpose behind
their instigation and creation of the Works and development of the factual record
and expert analysis will aid the district court in determining whether Appellees'
secondary use was "transformative." *See, e.g., Krafton, Inc. v. Apple, Inc.*, No. CV
22-209-GW-MRW, 2023 U.S. Dist. LEXIS 53494, at *9 (C.D. Cal. Feb. 24,
2023)("YouTube's argument attempting to establish Biubiubiu as transformative
[...] is clearly based upon interpretations of the film that could use some factual
and/ or expert development/explanation to substantiate").

The same justification applies with respect to the issue of Appellees' "bad
faith." *See, e.g., Apple Inc. v. Corellium, LLC*, No. 19-81160-cv, 2020 U.S. Dist.
LEXIS 136419, at *12 (S.D. Fla. July 30, 2020)("Second, good faith is a question
of fact, and Apple should be permitted to rebut Corellium's assertion of good faith
[in the context of the fair use defense] by way of [] expert opinions and
testimony"), *adopted,* 2020 U.S. Dist. LEXIS 236242, at *3 (S.D. Fla. Dec. 15,
2020).

There are also material factual disputes regarding the publication of the
Works that preclude dismissal. The Amended Complaint explicitly alleges that

Santos "did not publish the Works to anyone except Appellees under a personal use license and did not do so voluntarily because the Appellees misrepresented their identity and intended scope of use." A-16 at ¶44. However, the district court improperly resolved this factual dispute against Santos by concluding that "Santos published the Videos when he uploaded them to Cameo." A-239. This conclusion required the district court to draw inferences against Santos solely from the Cameo Terms of Service, without any factual development regarding the actual public availability of the Works. The district court's conclusion was thus contrary to the standard on a motion to dismiss.

Appellees' conduct and its effect on the market is also an issue that necessitates development of the record and expert opinion. *Krafton, Inc.*, 2023 U.S. Dist. LEXIS 53494, at *10 ("the 'potential market' question concerning development of video game properties into films is obviously a question that screams out for fact-development"); *see also Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 549 (S.D.N.Y. 2008) (relying extensively on expert testimony concerning market harm).

Development of the record and expert opinion is required to properly assess the harm "that would result from unrestricted and widespread conduct of the same sort" (*Hachette Book Grp., Inc.*, 115 F.4th at 189 (internal citations omitted)) given Cameo business model and the celebrity users that utilize the platform. Crucially,

this would include discussion as to whether the conduct similar to the Appellees' would curb celebrity participation, and development of the record concerning the licensing fees normally paid to secure such rights to Works such as Santos', expert opinion regarding industry standards for such markets, including on the Cameo platform. *See, e.g., Apple Inc.*, 2020 U.S. Dist. LEXIS 136419, at *11-12 (permitting expert testimony concerning industry standards in the context of the copyright fair use defense).

The Second Circuit has consistently held that on a motion to dismiss, a plaintiff is "held only to the usual burden of a motion to dismiss . . . which is to say [he] must plead sufficient facts to plausibly suggest that they are entitled to relief." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). The Amended Complaint clearly met this burden by alleging facts that, if proven, would establish copyright infringement. The district court's premature fair use determination denied Santos the opportunity to develop evidence supporting his claims and must be reversed.

**III.**

**THE DISTRICT COURT ERRED IN FINDING THAT FEDERAL LAW PREEMPTS APPELLANT'S STATE LAW CLAIMS**

**A.** **The Contractual Claims Pertaining To The Appellees' Misrepresentations Of Their Identity Are Qualitatively Different from Copyright Claims**

The district court erred in concluding that Santos' state law claims were preempted because they "ultimately" sought to prevent unauthorized public display of copyrighted works. This analysis misapprehends both the nature of Copyright Act preemption and the distinct rights Santos seeks to vindicate through his state law claims.

The Second Circuit has established that preemption analysis requires a "holistic evaluation of the nature of the rights sought to be enforced" to determine whether the state law action is "qualitatively different from a copyright infringement claim." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 302 (2d Cir. 2022). A mechanical search for "extra elements" is insufficient; courts must examine "what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Universal Instruments Corp. v. Micro Systems Engineering, Inc.*, 924 F.3d 32, 48 (2d Cir. 2019).

Here, Mr. Santos' contract claims arise primarily from Appellees' violation of their contractual obligation under the Cameo Terms of Service to provide

26 of 31

truthful identifying information when creating user accounts. The Amended Complaint specifically alleges that Appellees breached these terms by "creating fake profiles and falsely representing themselves as fans seeking personalized videos for personal use." A-18 at ¶59. This right to truthful identification is qualitatively different from the right to control copying or distribution protected by copyright law.

The district court's conclusion that these claims were "ultimately aimed at stopping the public display of his copyrighted works without a proper license" (A-248) improperly collapses distinct legal rights into copyright protection merely because they relate to copyrighted content. It conflates the right for Santos to control the scope of the use of the Works with the right to be fully informed regarding who he created the Works for. The Cameo Terms of Service secures this separate right for the benefit of celebrities, like Santos, that use its platform so that such celebrities can select the precise individuals for which they create content, and avoid creating content for those they do not want to.

Thus, the district court erred in concluding that federal copyright law preempts Santos' contractual claims. *Paramount Pictures Corp. v. Puzo,* No. 12-cv-1268, 2012 U.S. Dist. LEXIS 139827, at *18-19 (S.D.N.Y. September 26, 2012) (Nathan, D.J.) (*citing Forest Park Pictures v. Universal TV Network, Inc.,* 683 F.3d 424 (2d Cir. 2012)); *see also, e.g., Point 4 Data Corp v. Tri-State*

*SurgicalSupply,* 2019 U.S. Dist. LEXIS 250232, at *56 (E.D.N.Y. March 26, 2019) ("Limitations on the number of users who can utilize a copyrighted work bear no resemblance to any of the rights granted to a copyright holder under 17 U.S.C. § 106…"); *Brevet Holdings, LLC v. Enascor, LLC,* No. 21-cv-01540, 2022 U.S. Dist. LEXIS 17461, at *10-11 (S.D.N.Y. August 31, 2022) (Vyskocil, D.J.).

## B.   The Fraudulent Inducement Claim Is Not Preempted Because It Seeks Disgorgement

The district court's dismissal of the fraudulent inducement claim similarly failed to recognize the distinct nature of the remedy sought. While the district court correctly noted that New York law requires out-of-pocket losses for fraud claims, it overlooked that Santos specifically seeks disgorgement as an equitable remedy.

Under New York law, "where there is a claim based on fraudulent activity, disgorgement may be available as an equitable remedy, notwithstanding the absence of loss to individuals or independent claims for restitution." *People v. Ernst & Young, LLP*, 114 A.D.3d 569, 569 (1st Dept. 2014). Disgorgement is distinct from both copyright remedies and restitution because it "focuses on the gain to the wrongdoer as opposed to the loss to the victim." *Id.*

The Amended Complaint explicitly seeks "disgorgement of Defendants' profits" (A-23 at ¶C). This remedy addresses the fundamental unfairness of allowing Appellees to profit from their fraudulent scheme, regardless of whether Santos suffered direct monetary losses. The right to prevent unjust enrichment

through fraud is qualitatively different from copyright protection and should not be preempted.

## C. The District Court's Preemption Analysis Would Create a Dangerous Precedent

The district court's expansive view of copyright preemption would effectively immunize bad actors who use fraud to create copyrighted content, so long as their ultimate goal is public display of that content. This approach would create a perverse incentive for users to circumvent platform terms of service through deception, knowing their conduct would be protected by copyright law's fair use doctrine and federal preemption. It would also render Cameo, and others like it incapable of enforcing any of its contractual terms related to the content exchanged on the platform.

Such a result would particularly threaten emerging content platforms like Cameo that rely on trusted relationships between creators and users – and in Cameo's case, celebrities that are highly sensitive to the unlicensed use of their image, persona, and content. These platforms cannot function if users can freely misrepresent their identities to obtain content at lower prices, only to exploit it commercially.

## **CONCLUSION**

For these reasons, the Appellant respectfully requests the Court to vacate the district court's Opinion and Order dated August 18, 2024, direct that the Appellees' motion to dismiss be denied in its entirety, reinstate the Appellant's causes of action in full, and for any such other or further relief that the Court deems just and appropriate.

Dated: New York, New York
      October 28, 2024

          **MANCILLA & FANTONE, LLP**

      By: /s/ _Robert M Fantone_
        Robert Fantone, Esq.
        Andrew Mancilla, Esq.
        260 Madison Avenue, 22nd Floor
        New York, New York 10016
        P (646) 225-6686
        F (646) 655-0269
        robert@law-mf.com

          **JOSEPH W. MURRAY, ESQ.**

      By: /s/ _Joseph Murray_
        Joseph Murray, Esq.
        185 Great Neck Road, Ste. 461
        Great Neck, New York 11021
        (646) 838 – 1702
        Joe@murray-law.com

        _Attorneys for Appellant_
        _George Santos_

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6,436 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font (12 point for footnotes).


Robert Fantone, Esq.